**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION** | Case No.: SACV 07-01437-CJC(ANx) |
| **Plaintiff,** |  |
| vs. |  |
|  | **ORDER HOLDING ROBERT GRAY IN CIVIL CONTEMPT** |
| **FOREX LIQUIDITY LLC,** |  |
| **Defendant.** |  |

### I.     INTRODUCTION

Seeking to safeguard customers and creditors, Plaintiff United States Commodities Futures Trading Commission (the "Commission") initiated this action on December 13, 2007 against Defendant Forex Liquidity LLC ("Forex"). The

Commission alleged that Forex failed to meet minimum capital requirements and failed to keep adequate records to reflect its financial status.  On December 14, 2007, the Court appointed a Receiver to take control of Forex and take custody of its assets by issuing a Statutory Restraining Order ("SRO").  On January 25, 2005, the Court issued a Consent Order for Preliminary Injunction ("PI") that continued the SRO until the Court deemed otherwise.  These orders (collectively the "Receivership Orders") froze Forex's assets and enjoined Forex's agents from transferring or otherwise dealing with any of Forex's assets, except by the Court's approval.  The Receivership Orders also directed Forex and its agents to turn over all of Forex's assets to the Receiver.

Despite the Receivership Orders, Mr. Robert Gray, CEO and majority shareholder of Forex, has refused to turn over approximately $7.12 million that has repeatedly been listed as a Forex asset (the "Pro Fi Funds").  The Pro Fi Funds are held offshore by a San Marino company called Pro Fi.  Mr. Gray owns 95 percent of Pro Fi, and has repeatedly represented that he controls the Pro Fi Funds as assets of Forex.  Because Mr. Gray has failed to transfer these funds to Forex despite the Receivership Orders and the Receiver's requests, the Receiver moved the Court to hold Mr. Gray in contempt of court.  On July 14, 2009, the Court commenced a two-day evidentiary hearing to determine whether Mr. Gray violated the Receivership Orders.  Over the course of that hearing, the Receiver showed, by clear and convincing evidence, that the Pro Fi Funds are Forex's assets, that Mr. Gray controls the Pro Fi Funds, and that Mr. Gray has refused to transfer the Pro Fi Funds back to Forex in clear violation of the Court's Receivership Orders.  Accordingly, the Court now finds Mr. Gray in civil contempt.

## II.  FACTUAL BACKGROUND

Forex is an Orange County, California, futures commission merchant.  Forex's business facilitated its customers' speculation in foreign exchange futures contracts.  Simply put, Forex's customers made investments betting that certain currencies would increase or decrease in value relative to other currencies.  ("Hr'g Tr. ("Tr.") 2-6.)  Forex would hold accounts for customers, facilitate these currency trades, and act as counterparty to their customers' trades, taking positions opposite their customers.  (Tr. 2-7.)  Forex was registered with the Commodities Futures Trading Commission and was a member of the National Futures Association (the "NFA").  (Tr. 2-3, 7-9.)  To maintain its membership and remain in good standing, a firm like Forex must meet minimum capitalization requirements, submit weekly and monthly reports of its finances, and submit to outside audits every 9 to 18 months.  (Tr. 8:25.)  The NFA and CTFC require futures commission merchants to maintain adequate capital to protect customers in case of market fluctuations that could otherwise cause a firm to go out of business.  (Tr. 19:15-20.)

The NFA's compliance activities uncovered irregularities in Forex's accounting.  (Ex. 9.)  Forex represented to the NFA that it held, as one of its assets, a bond and $6.5 million in cash at a company called Malory Investments ("Malory").  (*Id.*)  However, the NFA discovered that the bond and the cash were not being held in Forex's account at Malory, but were instead purportedly being held in an account at Swiss Imperial Trust, A.G.  (*Id.*)  In a November 29, 2007 letter to Mr. Gray, the NFA's Director of Compliance Jennifer Sunu wrote that these facts raised concerns over whether Forex exercised sufficient control over the bond and the cash to consider them Forex's assets.  (*Id.*)  Accordingly, Ms. Sunu ordered Mr. Gray to transfer those assets into a regulated United States financial institution.  (*Id.*)  On December 1, 2007, Mr. Gray represented to Ms. Sunu in an email message that the assets had been

transferred to an account at Commonwealth Financial Network. (Ex. 11; Tr. 23:9-14.) Ms. Sunu contacted Commonwealth Financial Network and found that there was no account number matching the one Mr. Gray provided to Ms. Sunu. (Tr. 23:16-20.) In fact, Commonwealth Financial Network had no records of accounts in the names of Forex or Mr. Gray whatsoever. (*Id.*)

In response to regulatory concerns over the assets that were supposed to be at Commonwealth Financial Network, Forex attempted to convince Ms. Sunu that it met its minimum capital requirements without those assets. (Ex. 13; Tr. 27:8.) Statements sent by Forex to Ms. Sunu purport to show that Forex could meet requirements with, or without, the assets that Forex claimed were in the Commonwealth Financial Account. (Ex. 13.) These statements also showed that Forex had $11.2 million in funds in an account at Malory. (Ex. 13.) Ms. Sunu was dissatisfied with the statements Forex submitted. (Tr. 28:6.) For example, Forex claimed its total liabilities reported in December were "substantially less" than the liabilities Forex reported just a month before then. (Tr. 28:21.) Forex did this by accounting only for the liabilities it owed to retail customers, and by not accounting for the liabilities owed to institutional counterparties. (TR. 29:23-25.)

The $11.2 million purported to be at Malory were also a source of concern to Ms. Sunu. (Tr. 30:14-21.) Ms. Sunu had been previously unable to confirm the existence of funds at Malory in the past. (*Id.*) Additionally, the Financial Industry Regulatory Authority had advised Ms. Sunu that it had no indication that Malory possessed any assets approaching $11.2 million on its books. (*Id.*) Accordingly, Ms. Sunu requested that Forex transfer its assets at Malory to an account at U.S. Bank. (Tr. 31:4-8.) Forex and Mr. Gray were unable to accommodate that simple request. Mr. Gray and Forex's general counsel, Frank Masino, told Ms. Sunu that the Malory funds were actually held by a counterparty. (Tr. 33:2-5, 34:1.) That counterparty was

Pro Fi. (Ex. 18.) Throughout this process, letters repeatedly characterized the $11.2 million held at Pro Fi as a Forex asset. (Ex. 18.) In one letter, Mr. Gray ordered Malory to direct Pro Fi to release "approximately $11.2 million" to the U.S. Bank account. (Ex. 19.) A letter from Pro Fi President Antonella Cecere to Mr. Gray states that "the origination of funds was Forex Liquidity LLC and due to the urgency of the request, the balance of $11,127,469.12 will be sent directly to your U.S. Bank account. . ." (Ex. 20.) Forex did not to transfer the funds from Pro Fi to U.S. Bank by the NFA deadline. (Ex. 21 ¶ 19.)

After the failure of Mr. Gray's purported efforts to have the $11.2 million at Pro Fi transferred back to the United States, Ms. Sunu directed the NFA to issue a Member Responsibility Action against Forex for being unable to demonstrate that it was in compliance with capital requirements. (Ex. 21; Tr. 41:7-42:6.) Noncompliance with capital requirements is "a very serious violation" that "requires immediate action because customers could have the potential to be harmed." (Tr. 41:22-23.) Accordingly, the MFA largely shut down Forex's operations, requiring Forex to liquidate its positions and barring Forex from accepting customer funds or trading on customers' behalves. (Ex. 21.) Despite the seriousness of the violation at issue and the penalties levied against Forex, the NFA offered Forex the opportunity to stay the Member Responsibility Action against it, but Forex never petitioned the NFA for a stay. (Ex. 21; Tr. 43:3.)

In the ensuing days, Forex continued to represent that it was attempting to transfer the $11.2 million from Pro Fi to Forex's account in the United States, but was being prevented from doing so by regulatory issues. (Exs. 27-29.) By December 12, 2007, Forex was able to transfer approximately $4 million of the $11.2 million from the Pro Fi account to Forex's accounts in the United States—leaving approximately $7.1 million in the Pro Fi account—the Pro Fi Funds currently at issue. (Ex. 31-33.)

On December 14, 2007 the CTFC filed its action against Forex, and the Court's involvement began. (Ex. 35.) That $7.1 million, the Pro Fi Funds, have not been returned to Forex to date. (Tr. 52:7.)

Throughout this period, Mr. Gray represented to Ms. Sunu and the NFA that Pro Fi had an arm's-length relationship with Forex. The two companies, however, were inextricably linked. Gray owned and operated Pro Fi. Mr. Gray appointed a Forex employee, Mushag Tovmasyan, as president of Pro Fi when Mr. Gray purchased the company in 2006. (Tr. 92:9-21.) Mr. Gray owned 95 percent of Pro Fi, and Mr. Tovmasyan described Mr. Gray as Pro Fi's decision maker. (Tr. 93:6, 95:13.) Mr. Gray decided when money needed to be disbursed from Pro Fi. (Tr. 95:16.) Forex facilitated trades on behalf of Pro Fi customers. (Tr. 95:20.) Mr. Gray told Mr. Tovmasyan that Forex and Pro Fi could not be seen to do business directly with each other because of regulatory issues. (Tr. 96:18-21.) Mr. Gray explained to Mr. Tovmasyan that it was necessary to interpose Malory between Forex and Pro Fi, "because Malory did not have the same regulator and, therefore, it was allowed to do business with Pro Fi. (Tr. 96:19-21.) At the time of Ms. Sunu's investigation into Forex, Mr. Tovmasyan was in San Marino working at Pro Fi, although Mr. Gray had replaced Mr. Tovmasyan as president with Ms. Cecere to that post. (Tr. 97; Ex. 43.) Mr. Gray and Mr. Tovmasyan argued over the appropriate way to transfer funds from Pro Fi to Forex in response to the regulatory actions before the Court became involved in this matter. (Tr. 99:9-13.)

On December 14, 2007, the Court issued a Statutory Restraining Order and Order to Show Cause Regarding Preliminary Injunction. The SRO barred Forex and its agents from "directly or indirectly transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any assets. . ." (Ex. 35 ¶ 8.) The

Court also appointed a Receiver to: (1) assume full control of Forex; (2) take exclusive custody, control, and possession of all the funds, property, mail and other assets of, in the possession of, or under the control of Forex; and (3) preserve, hold and manage all receivership assets, among other duties. (Ex. 35 at 9-10.) Furthermore, the Court ordered anyone served with its order to deliver over to the Receiver: (1) possession and custody of all Forex funds, property, and all other assets; (2) possession and custody of Forex documents, including all financial and accounting records; (3) possession and custody of all funds and other assets belonging to members of the public now held by Forex; and (4) information identifying the accounts, employees, properties, or other assets or obligations of Forex. (Ex. 35 at 11-12.) Finally, the Court ordered Forex to "cooperate fully with and assist the Receiver," which includes providing any information the Receiver deems necessary. (Ex. 35 at 13.)

On January 25, 2008, the Court issued the PI. The Court recognized that Mr. Gray's attorneys had no objections to the entry of the PI. (Ex. 39 at 2.) The Court also stated that "there is good cause to believe that Defendant [Forex] has failed and will continue to fail to meet the minimum adjusted net capital requirements [and] has failed to maintain records that currently reflect its assets, liabilities, and capital. . ." (Ex. 39 at 3.) Accordingly, the PI continued the Receiver's term and ordered Forex to continue its full compliance with the SRO as a whole. (Ex. 39 at 6.)

Since the Court's involvement with Forex and its issuance of the Receivership Orders, Mr. Gray has failed to return the Pro Fi Funds to Forex. In fact, Mr. Gray has transferred money out of Pro Fi. (Exs. 40-42.) Mr. Gray even loaned funds from Pro Fi to a company managed by his brother. (Ex. 42.) Mr. Gray has not given the Receiver information about ties between Forex, Malory and Pro Fi. When deposed by the Receiver about Malory and Pro Fi, Mr. Gray invoked his Fifth Amendment right

against self incrimination in response to all questions regarding these two entities, except to confirm that he was a 95 percent shareholder of Pro Fi. (Ex. 47 at 13.) Mr. Gray also sought to keep funds from the Receivership. (Ex. 44.) In an email to Mr. Tovmasyan, Mr. Gray stated that he could not provide the Receiver with money to fully fund the Receivership Estate, even though that would improve Mr. Gray and Forex's situation. (*Id.*) "I cannot put the cash up as they will think it was hidden. A real catch 22." (*Id.*)

While the Receivership Estate has paid off claims made by Forex's former customers, it does not have sufficient funds to pay Forex's creditors. To meet Forex's obligations and to fulfill the Receiver's own duties under the Receivership Orders, the Receiver has sought the repatriation of the Pro Fi Funds. To date, the Pro Fi Funds have not been returned to the Receivership Estate.

### III.  ANALYSIS

The United States Supreme Court has held that "courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990). Civil contempt is distinguished from criminal contempt by the purpose and the character of the sanctions issued by a court. Sanctions for criminal contempt are punitive in nature, while "civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience." *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994). A court may make a finding of civil contempt and issue sanctions in an ordinary civil hearing upon notice and an opportunity to be heard. *Id.*

"Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorded Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993). Such contempt need not be willful. *Id.* To obtain a finding of civil contempt and sanctions, a party must show by clear and convincing evidence that the opposing party violated the court's order. *Id.*

District Courts have often found individuals or entities in civil contempt when they fail to turn funds over to a receiver or fail to freeze assets in violation of court orders. In *Federal Trade Commission v. Productive Marketing, Inc.,* a district court in the Central District of California found a nonparty in civil contempt for failing to turn over assets to a court-ordered receivership. 136 F.Supp.2d 1096, 1112-1113 (C.D. Cal. 2001). The district court sanctioned that nonparty the costs incurred by its intransigence, and issued a per diem fine that doubled each day the nonparty was out of compliance. *Id.* at 1113. In *SEC v. Current Financial Services, Inc.,* a district court found several individuals in civil contempt when, in contravention of a court-ordered asset freeze, transferred a company's assets back to its investors. 798 F.Supp. 802, 807-808 (D.D.C. 1992). In *Current Financial Services*, the district court put the asset freeze in place "to maintain the status quo until this Court determines the appropriate relief and, if possible, frames an equitable distribution among the investors." *Id.* at 807.

In the present case, the purpose of the Court's SRO is to prevent "immediate and irreparable damage to the Court's ability to grant effective final relief for customers in the form of monetary redress" by stopping the "sale, transfer, assignment or other disposition" of Forex assets. (Ex. 35 ¶ 3.) The SRO aimed to "preserve the status quo, to protect public customers from loss and damage, and to enable the CTFC to fulfill its statutory duties." (Ex. 35 ¶ 5.) The Court's Receivership Orders are

based upon the standard language used by federal courts and government agencies when appointing a Receiver and ordering an asset freeze. The wording of the Court's Receivership Orders is plain and clear. The Receivership Orders define assets broadly as "any legal or equitable interest in, right to, or claim to, any real or personal property, including but no limited to . . . accounts including bank accounts and accounts at financial institutions, receivables, contracts . . . and all cash." (Ex. 35 ¶ 7.) They restrain Mr. Gray and any of Forex's owners or agents from interacting with—by transferring, selling, assigning, loaning, or otherwise disposing of—any of Forex's assets except as directed by the Receiver. (Ex. 35 ¶ 8.) They direct anyone served with the SRO to deliver to the Receiver all Forex funds, property, and all other assets. (Ex. 35 at 12.)

The Receivership Orders bind Mr. Gray. The orders apply to "Defendant, its agents, owners, servants, employees, attorneys, and persons in active concert or participation with it who receive notice. . ." (Ex. 35 ¶ 8.) Mr. Gray, the principal owner and president of Forex, falls within the scope of this language. Although he is a nonparty in this action, Mr. Gray can be forced to abide by the terms of the Court's Receivership Orders. A preliminary injunction or restraining order binds both the parties and the parties' officers and agents. FED. R. CIV. P. 65(d). Mr. Gray also consented to the SRO and the PI that continued it. (Ex. 39 at 2) "Attorneys for Robert Gray, the principal shareholder and president of [Forex], have authorized the Receiver to represent to the Court that they have reviewed the form and contents of this Consent Preliminary Injunction Order, and they have no objection to the entry of this . . . Order.") The Receivership Orders bound Mr. Gray, and Mr. Gray was aware that he was bound by them.

Four simple facts show—by clear and convincing evidence—that Mr. Gray violated the Receivership Orders and should now be held in civil contempt of court.

First, the Receivership Orders required that all of Forex's assets be turned over to the Receiver. Second, the Pro Fi Funds are Forex assets, as Mr. Gray repeatedly represented that the Pro Fi Funds were Forex assets. Third, Mr. Gray had control over the Pro Fi Funds both as President of Forex and as the owner of Pro Fi. Fourth, Mr. Gray has not turned the Pro Fi Funds over to the Receiver. Mr. Gray has therefore disobeyed the Court's orders and is now in contempt of court.

The Receivership Orders required that all of Forex's assets be turned over to the Receiver. The SRO stated:

> IT IS FURTHER ORDERED THAT, immediately upon service of this Order upon them, Defendant, and any other person or entity served with a copy of this Order upon them, shall forthwith or within such time as permitted by Receiver in writing, deliver over to the Receiver:
>
> Possession and custody of all funds, assets, property, and all other assets, owned beneficially or otherwise, wherever situated, of the Defendant. . .

(Ex. 35 at 11-12.) The Pro Fi Funds are Forex assets. Over the course of Mr. Gray's dealings with Ms. Sunu and the NFA, Mr. Gray and Forex listed the Pro Fi Funds as assets of Forex. In two financial statements provided by Forex in a December 3, 2007 email to Ms. Sunu, Forex claimed $11.2 million in assets at Malory.[1] (Ex. 13.) In a letter to Mr. Gray on December 4, 2007, Ms. Cecere acknowledged that the funds held at Pro Fi originated at Forex. (Ex. 18.) In another letter dated December 4, 2007 Mr. Gray requested that Malory authorize "Pro Fi to honor our direct request to them to transfer the balance of FXLQ's funds they are holding, approximately $11.2 million." (Ex. 19.) Here, Mr. Gray identifies the Pro Fi Funds as belonging to FXLQ (Forex). These representations show that the Pro Fi Funds were Forex's assets.

---

[1] Forex's counsel copied Mr. Gray on the email.

It is undeniable that Mr. Gray controls the Pro Fi Funds. On December 10 and 11, 2007, Pro Fi transferred $4 million to Forex following direction from Mr. Gray. (Ex. 31-33.) Mr. Gray appointed Mr. Tovmasyan—a Forex employee—as president of Pro Fi, and replaced Mr. Tovmasyan with Ms. Cecere. (Tr. 92-95, Ex. 43.) Mr. Gray also decided when money would be disbursed from Pro Fi. ((Tr. 95:16.) While Mr. Gray portrayed Pro Fi and Forex as separate businesses, Pro Fi was in fact deeply affiliated with Forex. Forex and Pro Fi have a common owner—Mr. Gray. (Tr. 93:6.) The two companies had the same person managing their affairs—Mr. Gray. (Tr. 95.) Ultimately, the same person had control over the funds in each company's accounts—Mr. Gray. Accordingly, there was one person who most certainly had the power to transfer the Pro Fi funds to the Receiver. That person was Mr. Gray.

Finally, Mr. Gray has failed to return the remaining $7.1 million Pro Fi Funds to the Receiver. Despite his ability to return the Pro Fi Funds to their court-ordered place, Mr. Gray has evaded the Receivership Orders and the Receiver's efforts. Mr. Gray even admitted in an email to one of his associates that he had the money to pay off the receivership, but felt that he could not pay without others believing that Mr. Gray was hiding money. And Mr. Gray has provided no explanation of his actions even though he has had ample opportunity to do so in a deposition or at the evidentiary hearing. Instead of cooperating with the Receiver or providing any explanation, Mr. Gray sought to delay this moment by filing for bankruptcy, seeking refuge in the bankruptcy court's automatic stay, and then withdrawing his application. Now, Mr. Gray's opportunities for delay have ended.

The Court's purpose in issuing the Receivership Orders was to protect those who could have been trapped in the financial wreckage if Forex imploded like so many other financial firms. The relationship of Forex, Malory, and Pro Fi—of offshore accounts, shell companies, regulatory evasion and secret amalgamations—is

reminiscent of other financial scandals.  In this case, however, diligent monitoring by the NFA and the CTFC caught irregularities before they grew into a multi-million-dollar disaster.  All those who invested with or loaned money to Forex still have not yet received compensation from the Receivership, however.  Forex still owes its creditors money, causing a $2 to $3 million shortfall in the Receivership.  Faced with clear and convincing evidence that Mr. Gray has failed to obey the Court's Receivership Orders, the Court now finds Mr. Gray in civil contempt.

## IV. CONCLUSION

Mr. Gray is ordered to pay to the Receiver the sum of $7,127,469, on or before 9 a.m. on July 28, 2009.  Mr. Gray is also ordered to deliver to the Receiver all of the books and records of Pro Fi on or before 9 a.m. on July 28, 2009.

DATED: July 23, 2009

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE